## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAMES LEE FLETCHER, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 12-920-SRF |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## **REPORT AND RECOMMENDATION**

### **I.    INTRODUCTION**

Plaintiff James Lee Fletcher, Jr. ("Fletcher" or "Plaintiff") filed this action against defendant Carolyn W. Colvin, Commissioner of the Social Security Administration (the "Commissioner" or "Defendant")[1] on July 18, 2012. (D.I. 1) Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of a decision on November 16, 2010, by Administrative Law Judge ("ALJ") Barbara Powell, denying his claims for disability benefits ("DIB") and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act, respectively.

Presently before the court are cross-motions for summary judgment filed by Plaintiff (D.I. 11) and the Commissioner (D.I. 14). Plaintiff asks the court to enter an award of benefits or, alternatively, to remand this case for further administrative proceedings. (D.I. 12 at 2) The Commissioner requests that the court affirm the ALJ's decision. (D.I. 15 at 18) For the reasons set

---

[1] Carolyn W. Colvin became the Commissioner of Social Security on February 13, 2013, after this proceeding was initially filed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin replaced the previous Commissioner, Michael J. Astrue, as the defendant in this case.

1

forth below, I recommend that the court DENY Plaintiff's motion for summary judgment and GRANT the Commissioner's cross-motion for summary judgment.

## II. BACKGROUND

### A. Procedural History

On January 29, 2009, Plaintiff filed concurrent claims for DIB and SSI benefits alleging that he has been disabled since November 1, 2006. (D.I. 8 at 136-49) Plaintiff's claims for benefits were denied initially on April 23, 2009 (*id.* at 62-63), and on reconsideration on August 25, 2009 (*id.* at 64-65). On October 5, 2009, Plaintiff filed a written request for a hearing. (*Id.* at 81-82)

On August 16, 2010, the ALJ held an administrative hearing. The Plaintiff and a vocational expert ("VE") appeared and testified. (*Id.* at 39-61) On November 16, 2010, the ALJ found that Plaintiff was not disabled. (*Id.* at 22-32) The Appeals Council denied Plaintiff's request for review on May 23, 2012, rendering the ALJ's decision a final act of the Commissioner. (*Id.* at 1-5)

### B. Factual Background

The undisputed findings of the ALJ are that Plaintiff has not engaged in substantial gainful activity since November 1, 2006, the alleged onset date. (*Id.* at 24) Plaintiff has severe impairments consisting of cervical and lumbar degenerative disc disease. (*Id.*)

#### 1. Medical History

On March 1, 2006, Plaintiff saw Jay Freid, M.D., for lower back pain allegedly caused by his work-related injury, which occurred in February of 2006. (*Id.* at 256) Dr. Freid noted that Plaintiff suffered from lower back pain for many years, but experienced more pain since lifting a bag of dog food. (*Id.* at 41, 231, 256) Plaintiff stated that the Vicodin given to him in the emergency room alleviated the pain and that he was still working at the grocery store. (*Id.* at 256) Dr. Freid observed that Plaintiff was sitting with no obvious physical discomfort and was in no apparent

2

distress. (*Id.* at 257) Dr. Freid noted that Plaintiff's gait was slow and he had decreased range of motion in his lumbar spine. (*Id.*) Plaintiff's straight leg test was negative and he had no pain in his hip or knee with movement. (*Id.*) Dr. Freid found that although Plaintiff was tender over his lumbar paraspinals, his lumbar spine, cervical paraspinals, and cervical spine were not tender. (*Id.*) Dr. Freid further noted that Plaintiff had good cervical range of motion and normal strength in his lower extremities. (*Id.*) Dr. Freid prescribed physical therapy, changed Plaintiff's prescription from Motrin to Naprosyn, and instructed Plaintiff to take Vicodin only on occasion. (*Id.*)

On March 15, 2006, Plaintiff returned to Dr. Freid complaining of persistent back pain. (*Id.* at 258) Plaintiff stated that the physical therapy did not help and that the Vicodin made him feel nauseous. (*Id.*) Plaintiff continued to work at the grocery store, but stated that it was "difficult at times." (*Id.*)

On March 21, 2006, Plaintiff underwent an MRI on his lumbar spine. (*Id.* at 241) John Coll, D.O., interpreted the MRI and found marked degenerative disc changes accompanied by posterior disc protrusion centrally and towards the right. (*Id.*) Dr. Coll also reported disc material abutting the right S1 nerve root, mild degenerative disc changes, and a posterior disc bulge at L4-5. (*Id.*)

On March 24, 2006, Dr. Freid noted that Plaintiff continued to experience pain, but tried to function at work and was able to go to the gym. (*Id.* at 255) Dr. Freid found that Plaintiff had some tenderness of his lumbar paraspinals and decreased sensation in his right thigh, but the rest of his examination was normal. (*Id.*) Dr. Freid recommended that Plaintiff should resume physical therapy. (*Id.*) He also discussed the benefits of job modification, and prescribed Plaintiff Ultram. (*Id.*)

3

On March 30, 2006, Plaintiff began seeing Jerome Groll, M.D., as his primary care physician. (*Id.* at 231) At his initial visit, Plaintiff complained of neck pain after bumping his head into another person as he bent over to pick something up off of the floor. (*Id.*) He also described the injury to his back that occurred while lifting a bag of dog food at work. (*Id.*) Dr. Groll noted that Plaintiff had a decreased range of motion in the neck, tenderness of the left trapezius, decreased range of motion in the back with pain, and lumbar straightening. (*Id.*)

On April 27, 2006, Plaintiff saw Dr. Groll for a follow up appointment to address his back and neck pain. (*Id.* at 294) Plaintiff's pain was described as moderate and range of motion of the neck was normal in all directions. (*Id.*) Dr. Groll increased the dosage of Plaintiff's prescription for Percocet. (*Id.*) On June 6, 2006, Plaintiff advised Dr. Groll that his lower back pain had improved on the higher dosage of Percocet, however, he still had pain radiating down his side. (*Id.* at 293) Dr. Groll found that Plaintiff exhibited vertebral spinal tenderness in the lumbar spinal region as well as tenderness of the SI joint on the right side. (*Id.*) Plaintiff's motor systems and reflexes were normal, although he could only flex his lumbar spine until his fingers touched his knees. (*Id.*) Dr. Groll started Plaintiff on Neurotin and renewed Plaintiff's prescription for Percocet. (*Id.*)

On July 18, 2006, Plaintiff returned to Dr. Groll and reported that he was doing much better on the new medications. (*Id.* at 291) Dr. Groll performed a physical examination of Plaintiff and concluded that Plaintiff had no vertebral spinal tenderness or paraspinal spasm and that Plaintiff's range of motion improved allowing him to reach his fingers to approximately six inches above the ground. (*Id.* at 293)

Plaintiff saw Dr. Groll on August 30, 2006, and complained of constant, shooting pain after pushing too hard on a fifty-pound bag of dog food at work two days earlier. (*Id.* at 290) Dr. Groll

4

noted that Plaintiff was tender on the lower sacrum. (*Id.*) Plaintiff's straight leg raising test as well as extensions of the lower back caused back pain. (*Id.*) Dr. Groll advised Plaintiff to return to work in one week. (*Id.*)

Plaintiff saw Dr. Groll for similar complaints of pain in September and October of 2006. (*Id.* at 286-289) Dr. Groll increased Plaintiff's Percocet dosage and prescribed Lyrica. (*Id.* at 288) Shortly thereafter, on November 1, 2006, Plaintiff quit his job due to chronic back pain. (*Id.* at 41)

On November 2, 2006, Plaintiff began treatment with Coastal Pain Care Physicians ("Coastal") for pain management. (*Id.* at 254) He was prescribed Oxycodone, Soma, Celebrex, and Lidoderm patches. (*Id.*) On November 14, 2006, Plaintiff had an additional MRI performed on his lumbar spine, which revealed a small disc herniation with contact of the right S1 nerve root, and mild degenerative disc disease at L4-5. (*Id.* at 238) On December 12, 2006, Plaintiff described his pain as radiating lower back pain and stated that he had been in constant pain for the last two days. (*Id.* at 252) Plaintiff reported that he could not sleep because of his lower back pain. (*Id.*)

On January 11, 2007, a Coastal physician diagnosed Plaintiff with chronic neck and lumbar pain and prescribed him oxycodone. (*Id.* at 250-51) On February 8, 2007, Plaintiff complained that his pain medication was not working and that the oxycodone was not providing relief from his chronic pain. (*Id.* at 249) On March 8, 2007, Plaintiff again stated that the pain medication was not helping and that his pain had increased over the last couple of days. (*Id.* at 248) The Coastal physician diagnosed Plaintiff with chronic lumbar pain. (*Id.*) On May 3, 2007, Plaintiff returned to Coastal complaining of lower back pain radiating to the lower part of each of his legs. (*Id.* at 247) On May 16, 2007, Plaintiff stated that he was able to sleep more comfortably and that the pain medication was working better. (*Id.* at 245) On May 31, 2007, Plaintiff reported that his pain was a nine out of ten, and he was prescribed methadone and oxycodone. (*Id.* at 242) Plaintiff

5

subsequently ended his treatment with Coastal and returned to Dr. Groll because he was unhappy with the pain management physician. (*Id.* at 284)

On June 12, 2007, Plaintiff reported to Dr. Groll that his pain was "not too bad with the medication" and that his neck pain was intermittent. (*Id.*) Dr. Groll found that Plaintiff's range of motion in his neck was limited in all directions, and noted vertebral spine tenderness in the lumbar region and a positive straight leg raising test. (*Id.*) On July 11, 2007, Plaintiff stated that his lower back pain was "pretty good," rating it as a four on a scale of one to ten. (*Id.* at 282) On August 9, 2007, Plaintiff stated that "it took hours to work out the pain in the morning." (*Id.* at 280) Dr. Groll found that Plaintiff's range of motion in his neck was limited in all directions, and noted vertebral spine tenderness in the cervical spine midline. (*Id.*) Plaintiff's straight leg raising test was negative bilaterally. (*Id.*)

On September 1, 2007, Plaintiff went to the Beebe Medical Center emergency room complaining of back pain after playing the game horseshoes. (*Id.* at 223) Plaintiff was given pain medication and was discharged after the medication began to relieve his pain. (*Id.* at 224-25) The emergency room report indicates that Plaintiff "appear[ed] comfortable," and lists a final diagnosis of sciatica. (*Id.* at 225)

Plaintiff saw Dr. Groll in February, April, and August of 2007 for pain medication refills. (*Id.* at 265, 267, 271) On October 10, 2007, Plaintiff saw Dr. Groll for medication management. (*Id.* at 275) Plaintiff rated his pain as nine out of ten without medication, and six out of ten with medication. (*Id.*) Plaintiff's straight leg raising test was negative bilaterally, but caused back pain. (*Id.*) Dr. Groll noted that Plaintiff's range of motion flexion of the lower back was markedly limited. (*Id.*) Plaintiff had no vertebral spine tenderness, no paraspinal spasm, and "no tenderness on his SI joints." (*Id.*)

6

On January 2, 2008, Plaintiff stated that his pain was worse in the morning but that he felt the pain all day long. (*Id.* at 273) Plaintiff's straight leg raising test was negative bilaterally, and he had no vertebral spine tenderness in his lower back or neck. (*Id.*) On February 21, 2008, Dr. Groll noted vertebral spine tenderness and paraspinal spasm in Plaintiff's lower back. (*Id.* at 271) Plaintiff had lumbar straightening, and his range of motion flexion of the lower back was markedly limited. (*Id.*) On April 28, 2008, Dr. Groll found that Plaintiff had back pain with straight leg raising, limited side bending, vertebral spine tenderness and paraspinal spasm in his lower back, and lumbar straightening. (*Id.* at 267) On August 5, 2008, Dr. Groll noted that Plaintiff had lumbar straightening, vertebral spinal tenderness in the lower back, and straight leg raising caused back pain. (*Id.* at 265)

In November 2008, Plaintiff unilaterally increased his dosage of oxycodone from one to six pills a day. (*Id.* at 263) As a result, he ran out of his medication early. (*Id.*) Dr. Groll examined Plaintiff on November 20, 2008 and found that Plaintiff had lumbar straightening and vertebral spine tenderness in his lower back. (*Id.*) Dr. Groll noted that Plaintiff "wince[d] in pain" when attempting to lie down, and when lying flat, he kept his hips at a 45-degree angle and his knees bent. (*Id.*)

On March 4, 2009, Dr. Groll reported that Plaintiff had lumbar straightening, and winced in pain when transitioning to lie down. (*Id.* at 324) Plaintiff had vertebral spinal tenderness in the lower back and his straight leg raising test was negative bilaterally. (*Id.*) On April 20, 2009, Dr. Groll found that Plaintiff had vertebral spinal tenderness in the lower back, lumbar straightening, and his straight leg raising test was positive. (*Id.* at 326) Plaintiff's range of motion of lower back was limited in all directions. (*Id.*) Dr. Groll discontinued Plaintiff's prescription for oxycodone and started Plaintiff on Dilaudid. (*Id.*)

7

Plaintiff saw Dr. Groll for a follow up appointment on May 19, 2009. (*Id.* at 328) Plaintiff had vertebral spine tenderness in the lower back, lumbar straightening, and his straight leg raising test caused back pain. (*Id.*) On June 22, 2009, Plaintiff saw Dr. Groll with complaints of back pain and pain radiating down his leg to his knee. (*Id.* at 330) Plaintiff stated that his pain medication was not strong enough. (*Id.*) Dr. Groll noted that Plaintiff's straight leg raising caused back pain, he had vertebral spinal tenderness in the lower back, and his range of motion of the lower back was limited. (*Id.*)

On the same date, Dr. Groll completed a Multiple Impairment Questionnaire in connection with Plaintiff's claims for disability benefits. (*Id.* at 305-12) Dr. Groll diagnosed Plaintiff with lumbar disk disease and cervicalgia. (*Id.* at 305) Dr. Groll noted that Plaintiff could sit for two hours in an eight-hour day, and stand/walk for two hours in an eight-hour day. (*Id.* at 307) Dr. Groll further indicated that Plaintiff must get up and move around every fifteen to twenty minutes, and that Plaintiff could not continuously walk/stand in the work setting. (*Id.* at 307-08) Plaintiff could occasionally lift and carry up to twenty pounds, but could never lift or carry over twenty pounds. (*Id.* at 308)

Question eighteen of the Multiple Impairment Questionnaire (which is relevant to the discussion below) provides:

18.  Does your patient's condition interfere with the ability to keep the neck in a constant position (e.g. [sic] looking at a computer screen, looking down at the desk)?

    ___ Yes    ___ No

If so, can your patient do a full time competitive job that requires that activity on a sustained basis. [sic]

    ___ Yes    ___ No

(*Id.* at 309-10) Dr. Groll checked "Yes" for both answers. (*Id.*)

8

On July 11, 2009, Dr. Groll submitted to Plaintiff's attorney a narrative report addressing Plaintiff's condition and prognosis. (*Id.* at 302-04) Dr. Groll concluded in the report that Plaintiff "will never be able to work in a full time competitive job environment." (*Id.* at 304)

Plaintiff continued to see Dr. Groll as his primary physician after his claims for disability benefits were filed. On July 20, 2009, Plaintiff saw Dr. Groll for complaints of pain, and stated that his pain medication failed to relieve his pain for more than one hour. (*Id.* at 331) Dr. Groll indicated in his notes that Plaintiff "tries to act as if he has trouble recalling the name oxycodone which he was prescribed for over a year. He stutters and acts like he can't recall the last 2 syllables in the name." (*Id.*) Upon examination, Dr. Groll found that Plaintiff had lumbar straightening, vertebral spine tenderness in the lower back, and a positive straight leg raising test. (*Id.*) Dr. Groll recommended that Plaintiff see a pain specialist. (*Id.*)

On April 21, 2009, Karen Sarpolis, M.D., a state agency medical consultant, completed a physical residual functional capacity ("RFC") assessment in connection with Plaintiff's claim for disability benefits. (*Id.* at 295-300) Dr. Sarpolis did not examine Plaintiff in person, but reviewed his medical records. (*Id.* at 295) Dr. Sarpolis indicated that Plaintiff was capable of lifting/carrying twenty pounds occasionally and ten pounds frequently. (*Id.* at 296) Dr. Sarpolis further found that Plaintiff had no push/pull limitations, and could occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl. (*Id.* at 296-97) Dr. Sarpolis concluded that Plaintiff could stand/walk for at least two hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (*Id.* at 296) On August 27, 2009, N. Britman reviewed Dr. Sarpolis' findings and issued a report affirming Dr. Sarpolis' RFC assessment. (*Id.* at 345)

On October 28, 2009, Plaintiff had another visit with Dr. Groll. (*Id.* at 359) Plaintiff stated that his low back pain was worse since his last visit, he "was not able to walk much due to pain"

9

and "spends most of his day sitting." (*Id.*) Plaintiff indicated that he was involved in a car accident on October 15, 2009, but did not present to the emergency room. (*Id.*) Upon examination, Dr. Groll found that Plaintiff had vertebral spine tenderness at the cervical spine midline, trapezius tenderness bilaterally, and Plaintiff's range of motion of the neck was limited in all directions. (*Id.*) Dr. Groll further noted that Plaintiff had paraspinal muscle tenderness and vertebral spine tenderness of the lower back. (*Id.*) Plaintiff's straight leg raising test caused back pain. (*Id.*)

One week prior to the administrative hearing, Plaintiff began seeing two new physicians; Dr. Chan, as his general practitioner, and Anthony Manonmani, M.D., as his pain management doctor.[2] (*Id.* at 47)

## 2. The Administrative Hearing

The ALJ held an administrative hearing on August 16, 2010. (*Id.* at 39) Plaintiff and a vocational expert ("VE") testified at the hearing. (*Id.* at 39-61) Plaintiff was represented by counsel. (*Id.* at 39)

### 1. Plaintiff's Testimony

Plaintiff was forty-one years old at the time of the hearing. (*Id.* at 40) He finished high school and has worked various manual labor jobs throughout his life, such as grinder, off-set printer, and warehouse stocker. (*Id.* at 40-43) Plaintiff testified that he lives with his uncle, who supports him financially. (*Id.* at 40, 41) Plaintiff has no source of income, but receives medical assistance from the State of Delaware. (*Id.* at 41)

Plaintiff testified that he has not worked since November 1, 2006. (*Id.*) He does his own laundry, but no other chores. (*Id.* at 44) Plaintiff stated that he can do light cooking, but eats mostly microwave meals and spends most of his time in bed or sitting in a recliner. (*Id.* at 44-45) Plaintiff

---

[2] The ALJ did not review the treatment records of Dr. Chan or Dr. Manonmani. (*See* D.I. 8 at 28)

10

testified that he used to go out for long walks, but is no longer able to do so because of pain in his hip caused by his back injury. (*Id.*) Plaintiff testified that he smokes half a pack of cigarettes per day. (*Id.*) Plaintiff also testified that he believes his condition has worsened in the previous year. (*Id.* at 50) Plaintiff stated that he was hospitalized once in the last twelve months, after falling while getting out of the shower. (*Id.* at 49-50) Plaintiff also testified that he takes thirty milligrams of oxycodone, six times per day. (*Id.* at 46)

## 2. Vocational Expert's Testimony

The ALJ posed the following hypothetical to the VE:

41 years old, high school education, past work history you described with the following restrictions. He can lift and carry twenty pounds occasionally, ten pounds frequently, but no more; stand and walk in excess of two hours in a work day, but less than six. He can sit six hours in a work day. His dominant right upper extremity is limited in push/pull to occasional. He can occasionally stoop, crouch, crawl, squat, kneel, and balance. I would say no stooping, no crawling. I would impose hazard restrictions for ladders or scaffolds, dangerous heights, and dangerous machinery. He can occasionally reach only occasionally, not frequently or constantly with the dominant right hand. I would avoid concentrated exposure to cold and to vibration. Would there be jobs in significant numbers such a hypothetical individual could do on a sustained basis in the competitive work force?

(*Id.* at 57) The VE testified that the individual described would be able to work in occupations including information clerk, gate tender, and copier operator. (*Id.* at 58) The VE further explained that none of Plaintiff's prior relevant work experience would apply. (*Id.* at 57)

The ALJ subsequently changed the hypothetical to describe a person that could be sedentary with the same other restrictions previously imposed. (*Id.* at 58) The VE testified that such an individual would be able to work in occupations including order clerk, credit clerk, and security monitor. (*Id.* at 59)

11

### 3. The ALJ's Findings

The ALJ determined that Plaintiff has not been under a disability within the meaning of

the Social Security Act from November 1, 2006 through the date of her decision. (*Id.* at 22-32)

The ALJ found, in relevant part:

1. The claimant meets the insured state requirements of the Social Security Act through December 21, 2011.

2. The claimant has not engaged in substantial gainful activity since November 1, 2006, the alleged onset date.

3. The claimant has the following severe impairments: cervical and lumbar degenerative disc disease.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.

5. . . . [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can lift and or carry twenty pounds occasionally, and ten pounds frequently. The claimant can stand/walk in excess of two hours per day, but less than six hours and can sit for six hours in an eight hour workday. The claimant can occasionally push and/or pull the dominant right upper extremity and reach with the dominant right hand. The claimant can occasionally crouch, squat, kneel and balance. The claimant should not crawl. The claimant must avoid concentrated exposure to cold and vibrations with hazard restrictions for ladders, scaffolds, heights and dangerous machinery.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on March 17, 1969 and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 1, 2006, through the date of this decision.

(*Id.* at 24-32)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190-91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the Supreme Court has explained, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and

13

support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act provides insurance benefits "to persons who have contributed to the program and who suffer from a physical or mental disability." 42 U.S.C. § 423(a)(l)(D); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(l)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003). In order to qualify for disability insurance benefits, a claimant must establish that he was disabled prior to the date he was last insured. 20 C.F.R. § 404.131; *Matullo*, 926 F.2d at 244.

14

To determine whether a claimant is disabled under the Act, the Commissioner is required to perform a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. See 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating a finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating a finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

At step four, the Commissioner determines whether the claimant retains the RFC to perform his past relevant work. See 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating that a claimant is not disabled if he is able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant

15

bears the burden of demonstrating an inability to return to his past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude him from adjusting to any other available work. See 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating a finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See id.* In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

## B. Analysis

Plaintiff asserts three arguments on appeal: (1) the ALJ improperly discounted the opinions of Plaintiff's treating physician, Dr. Groll; (2) the ALJ failed to properly evaluate Plaintiff's credibility; and (3) the ALJ improperly relied upon the "flawed" expert testimony of the VE. (*See* D.I. 12 at 15-16)

### 1. The ALJ's Decision Not to Accept the Opinions of Dr. Groll is Supported by Substantial Evidence

In determining the proper weight to be given to a medical opinion, the ALJ is required to weigh all the evidence and resolve any material conflicts. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971). The ALJ must first assess whether a medical opinion is from a treating, non-treating, or non-examining source. 20 C.F.R. §§ 404.1502, 416.902; *see also Clark v. Astrue*, No.

CIV.A. 09-192, 2010 WL 3909161, at *7-8 (D. Del. June 30, 2010) *report and recommendation adopted,* No. 1:09-CV-192, 2010 WL 3907772 (D. Del. Sept. 29, 2010). A treating source is a "physician, psychologist, or other acceptable medical source" who provides a patient with "medical treatment or evaluation," and has an "ongoing treatment relationship" with the patient. 20 C.F.R. §§ 404.1502, 416.902. A medical source may be considered a treating source where the claimant sees the source "with a frequency consistent with accepted medical practice for the type of treatment ... required for [the claimant's] condition(s)." *Id.* A medical source is not a treating source if the treatment is based "solely on [the claimant's] need to obtain a report in support of [his or her] claim for disability," and not based on medical need for treatment. *Id.*

The ALJ identifies Dr. Groll as a "treating medical source." (D.I. 8 at 30) A treating source's opinion is entitled to controlling weight when it is supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Fargnoli v. Massanari,* 247 F.3d 34, 42 (3d Cir. 2001). The Third Circuit has stated that "treating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Plummer,* 186 F.3d at 429 (quoting *Rocco v. Heckler,* 826 F.2d 1348, 1350 (3d Cir.1987)).

A treating source's opinion may be rejected "on the basis of contradictory medical evidence," *Plummer,* 186 F.3d at 429, or if unsupported by sufficient clinical data, *Newhouse v. Heckler,* 753 F.2d 283, 286 (3d Cir.1985). "Even where there is contradictory medical evidence . . . and an ALJ decides not to give a treating physician's opinion controlling weight, the ALJ must still carefully evaluate how much weight to give the treating physician's opinion." *Gonzalez v. Astrue,* 537 F. Supp. 2d 644, 660 (D. Del. 2008). The opinion may be accorded "more or less

weight depending upon the extent to which supporting explanations are provided." *Plummer,* 186 F.3d at 429 (citing *Newhouse,* 753 F.2d at 286).

When a treating source's opinion is not given controlling weight, the ALJ must determine what weight to give the treating, non-treating, and non-examining sources by considering factors such as the length of the treatment relationship and frequency of visits, nature and extent of the treatment relationship, whether the medical source supports the opinion with medical evidence, whether the opinion is consistent with the medical record, and the medical source's specialization. 20 C.F.R. §§ 404.1527(d), 416.927(d). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports," and may not reject a treating physician's opinion "due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317.

The ALJ's decision to reject Dr. Groll's opinion is supported by substantial evidence. The ALJ explained that she did not accept Dr. Groll's final opinion because it was "not supported by medical signs and laboratory findings, specifically the November 14, 2006 MRIs." (D.I. 8 at 30) The ALJ further noted that Dr. Groll's opinions were primarily based on Plaintiff's subjective complaints of pain, which varied widely throughout the treatment relationship and were not consistent with the objective medical evidence on the record. *(Id.* at 26-27, 30)

Over the course of his treatment of Plaintiff in 2006 and 2007, Dr. Groll recommended multiple medications at increasing dosages and gave Plaintiff permission to resume working. (D.I. 8 at 290, 293) On July 11, 2007, Plaintiff rated his back pain as a four on a scale of one to ten. *(Id.* at 282) At other visits, Plaintiff rated his pain much higher, but indicated that the pain was manageable with medication. *(Id.* at 275) The MRI performed on November 14, 2006 showed minimal findings of "moderate narrowing of the spinal canal at C5-C6; mild foraminal narrowing

18

at C3-C4 and C4-C5 but no cord compression, canal or nerve root compromise and a small disc herniation at L5-S1, and mild degenerative disc disease at L4-L5." (*Id.* at 30) Viewing Plaintiff's subjective complaints of pain in conjunction with the minimal findings in the November MRI, the ALJ determined that Dr. Groll's opinions were "not supported by medical signs and laboratory findings." (*Id.* at 30)

In addition to the minimal findings in the November MRI and Plaintiff's subjective complaints of pain, the ALJ highlighted inconsistencies within Dr. Groll's own findings. On June 22, 2009, Dr. Groll completed a Multiple Impairment Questionnaire in connection with Plaintiff's claims for disability benefits, indicating that Plaintiff could sit for two hours in an eight hour day, stand/walk for two hours in an eight hour day, and occasionally lift and carry up to twenty pounds. (*Id.* at 307-08) In the questionnaire, Dr. Groll referenced Plaintiff's MRI findings and diagnosis of degenerative disc disease, and represented that Plaintiff could work in a full time competitive job that required the limiting activity on a sustained basis. (*Id.* at 310) However, on July 11, 2009, Dr. Groll submitted a narrative report citing the same medical evidence and clinical findings, but concluding that Plaintiff "will never be able to work in a full time competitive job environment." (*Id.* at 302-04) Dr. Groll cited no new medical evidence to support his change in opinion regarding Plaintiff's ability to work. Absent from his narrative is an explanation for his change of opinion in less than a month's time concerning Plaintiff's ability to work full time.[3] (D.I. 8 at 303)

Dr. Groll's opinions also conflict with the opinions of state agency medical consultants Dr. Sarpolis and Dr. Britman. Dr. Sarpolis based her assessment upon her review of Plaintiff's medical

---

[3] Dr. Groll is a primary care physician. Plaintiff does not argue that Dr. Groll is a specialist in spinal disorders involving cervical and lumbar degenerative disc disease. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

records and daily activities, but did not physically examine Plaintiff. (*Id.* at 295-300) Based on the review of the record evidence, including Plaintiff's MRI results and Dr. Groll's treatment notes, Dr. Sarpolis indicated that Plaintiff was capable of lifting/carrying twenty pounds occasionally and ten pounds frequently, Plaintiff had no push/pull limitations, and Plaintiff could stand/walk for at least two hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (*Id.* at 296) Dr. Britman, who reviewed Dr. Sarpolis' assessment and the evidence in Plaintiff's medical file, issued a report affirming Dr. Sarpolis' opinion. (*Id.* at 345) Ultimately, the ALJ concluded that Dr. Sarpolis' RFC findings corresponded with the medical evidence of record, whereas Dr. Groll's final conclusions were generally inconsistent. (D.I. at 32) The ALJ's decision to credit the opinions of the stage agency medical consultants was proper because the ALJ demonstrated that those opinions were consistent with the record evidence as a whole. *See Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991) (concluding that the ALJ "correctly determined that the opinions of Jones's treating physicians were not controlling" in view of two state agency physicians' contradictory findings based on the claimant's medical records); *see also Bates v. Astrue*, 2008 WL 1736819, at *13 (D. Del. Apr. 11, 2008) ("Where, as here, the opinions of state agency physicians . . . are consistent with the record evidence as a whole, the A.L.J. is entitled to rely on them and they are substantial evidence supporting his decision."). Consequently, the ALJ's decision is supported by substantial evidence.

## 2. The ALJ Properly Evaluated the Credibility of the Plaintiff

An ALJ must undertake a two-step process in evaluating a claimant's subjective complaints of pain. *See* 20 C.F.R. § 404.1529; SSR 96-2P; SSR 96-7p at *2; *see also Conn v. Astrue*, 852 F. Supp. 2d 517, 527 (D. Del. 2012). First, the ALJ must determine whether there is an impairment that could reasonably be expected to produce the claimant's pain. *See Conn*, 852 F. Supp. 2d at

527. Second, the ALJ must "evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id.* When subjective complaints of pain are unsubstantiated by objective medical evidence, the ALJ's evaluation requires a finding as to the claimant's credibility. *Id.* The regulations require that credibility determinations be made based upon a review of the entire record. *Id.*

In addition to the objective medical evidence, the ALJ should consider: "(1) daily activities; (2) location, duration, frequency and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) effectiveness of medications used in treating pain; (5) treatments other than medications that alleviate pain; (6) any other non-treatment measures that help alleviate pain (such as lying down); and (7) any other factors that relate to the pain at issue." *Conn*, 852 F. Supp. 2d at 527. The court must also consider whether Plaintiff is consistent in his statements. *Id.* The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* This degree of specificity "is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned ... decision." *Id.*

The ALJ's decision recognizes that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (D.I. 8 at 26) However, the ALJ properly determined that Plaintiff's statements concerning the intensity, persistence and limiting effects of his pain were not credible because they were inconsistent with evidence on the record indicating that Plaintiff's pain was minimal. (*Id.*) For example, on July 18, 2006, Plaintiff reported that his pain was improving with the new medication, and on August 30, 2006, Dr. Groll informed Plaintiff

21

that he could return to work after one week. (*Id.* at 290-91) On June 12, 2007, Plaintiff reported that his back pain was "pretty good," rating it as a four on a scale of one to ten. (*Id.* at 282) On September 1, 2007, Plaintiff was able to participate in a game of horseshoes before he ran out of medication. (*Id.* at 223) The ALJ noted that Plaintiff denied severe pain during multiple visits with Dr. Groll, and he exhibited a full range of motion in his neck and limited range of motion in his back throughout most of his visits in 2006 and 2007. (*Id.* at 26-27) Additionally, the ALJ cited Plaintiff's acknowledgement that the prescribed medication helped him manage the pain in his back, and he was able to do physical therapy and work on a consistent basis. (*Id.*) For these reasons, substantial evidence supports the ALJ's credibility determination.

### 3. The ALJ Properly Relied Upon the Expert Testimony of the VE

Contrary to Plaintiff's contentions, the ALJ properly relied upon the VE's testimony reflecting Plaintiff's limitations. (D.I. 12 at 15-16) Plaintiff essentially asks the court to re-evaluate the evidence relating to his physical impairment and decide the outcome. (D.I. 15 at 18) A court may not undertake a *de novo* review of the ALJ's decision or re-weigh the evidence of record. *Barnhill v. Astrue*, 794 F. Supp. 2d 503, 513 (D. Del. 2011). The ALJ posed a hypothetical to the VE that properly reflected the medically established limitations contained in the record. Thus, the ALJ did not err by relying on the VE's testimony.

### V. CONCLUSION

For the foregoing reasons, I recommend that the court DENY Plaintiff's motion for summary judgment and GRANT the Commissioner's cross-motion for summary judgment.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed.

R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. Appx. 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: February 11, 2015

Sherry R. Fallon
United States Magistrate Judge